IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

AARON PRATER,

                    Plaintiff,

v.                                            Case No. 2:23-cv-02572-EFM-TJJ

JOHNSON COUNTY COMMUNITY
COLLEGE, LEROY COX, JERRY
MARCELLUS, LARRY McCLOUD
And LEE CROSS,

                    Defendants.

## SECOND AMENDED COMPLAINT

Aaron Prater, by and through counsel Theodore J. Lickteig, states as and for his

Second Amended Complaint in this action pursuant to Fed. R. Civ. P. 15(a)(2) as follows:

PARTIES, JURISDICTION AND VENUE

1.   Aaron Prater is an individual who at all times material hereto was a resident of the state

of Missouri.

2.   Johnson County Community College is a community college established pursuant to

Kansas law, specifically, K.S.A. 71-1101, et seq. and is a "municipality" because it is a

"community junior college" under K.S.A. 12-105a(a).

3.   JCCC's primary facilities are in Overland Park, Kansas.

4.   Leroy Cox is an individual who is a resident of the state of Missouri, and who

may be served with process at 12345 College Boulevard, Overland Park, Kansas 66210.

5.   Jerry Marcellus is an individual who is a resident of the state of Missouri, and

who may be served with process at 12345 College Boulevard, Overland Park, Kansas 66210.

6.   Larry McCloud is an individual who is a resident of the state of Missouri, and who

may be served with process at 12345 College Boulevard, Overland Park, Kansas 66210.

7.   Lee Cross is an individual who is a resident of the state of Kansas, and who may be served with process at 12345 College Boulevard, Overland Park, Kansas 66210.

8.   The Plaintiff presented a notice of claim to the Defendant that included the Kansas tort claim pleaded in this action on February 1, 2023.

9.   More than 120 days have passed since February 1, 2023 and the date this action was commenced.

10. JCCC did not approve the claim.

11. By operation of K.S.A. 12-105b(d), the claim is deemed denied.

12. The Plaintiff has exhausted his administrative remedies. This Court has jurisdiction of this action.

13. This Court has concurrent jurisdiction with federal courts over the Plaintiff's claims brought pursuant to 42 U.S.C. § 1983.

14. Venue is properly placed with this Court pursuant to K.S.A. 60-603(1), (3) and (4).

<u>ALLEGATIONS OF FACT</u>

<u>PLAINTIFF'S EMPLOYMENT HISTORY</u>

15. Aaron Prater began work at Johnson County Community College when he was hired as a full-time temporary professor in the Hospitality Department in the Fall of 2010.

16. Prater was hired on a full-time basis as an assistant professor in the Hospitality Department after the Fall semester of 2011. After three years, Prater became an associate professor and after ten years he became a professor.

17. Prater taught the culinary arts. The classes he taught included Professional Cooking 1

and 2, Fundamentals of Baking, Food and Beverage Management, Meat Fabrication, Local Foods and Advanced Foods.

<u>PLAINTIFF'S PERFORMANCE REVIEWS AND SUPERVISORS</u>

18. Leroy Cox was Dean of the JCCC Business Division since 2018. The Hospitality Department is within the Business Division.

19. In performance reviews of Prater's work the reviews indicated that he was recommended for continued employment in reviews dated May of 2012, 2013, and 2014.

20. In performance reviews of Prater's work the reviews indicated that he met expectations, which was the highest possible rating in each category he could receive in reviews dated April of 2015 through April of 2020.

21. In May, 2020, Dean Cox provided Prater with his 2020 performance review, which indicated that he met expectations, and which was the highest possible rating he could receive. The 2020 review included a separate narrative.

22. On June 15, 2020, Prater provided Dean Cox with a written response to Cox' narrative that accompanied the 2020 performance review. On the same day, Prater met with Dean Cox to discuss his 2020 performance review of Prater. On June 16, 2020, Dean Cox provided Prater a revised version of the narrative that accompanied the 2020 performance review.

23. Dean Cox's revised narrative commented and directed Prater as follows:

> It was asserted that many of his colleagues were afraid of him, afraid that he will report them for some wrongdoing that will land them in Human Resources, or launch a campaign against them that challenges their credibility and will ultimately get them fired. Going forward, Aaron should be mindful of this perception. If any of these allegations have merit, Aaron needs to stop policing his colleagues; honor the chain of command within his area, which means to address his problems to the Interim Director of the unit and, if he cannot gain remedy there, take his problems to the Dean of his division, not other deans …

24. In late spring of 2020, Jerry Marcellus became the Interim Director of the Hospitality

Department.  Before that, he was a full-time faculty member of the Department. The dean of Prater's Division at that time was Dean Cox.

25. In November, 2020, Dean Cox completed a Classroom Observation Report Form for Prater. The comments in the Report were positive.

26. Bridget McNabb was the purchasing coordinator for the JCCC Hospitality Department, and she had held that position for at least the eight years before 2020. In that role, she ordered the food for the Hospitality Department. Prater was not McNabb's supervisor. Prater had raised concerns with food purchasing and food safety in the Hospitality Department since about 2017.

27. Larry "Mickey" McCloud was the Chief Academic Officer and Executive Vice President of Academic Affairs for JCCC. In December, 2020, the Hospitality Department faculty had a meeting with McCloud, Dean Cox and the Hospitality Director, Mik Milster. The faculty was asked to submit a document with their concerns. Prater did not contribute to that document. The document was submitted to McCloud and to Dean Cox.

COMPLAINTS ABOUT THE PLAINTIFF

28. Prater created a spreadsheet to help streamline purchasing issues for the Department. The purchasing guidelines for the Department changed several times from 2018 through 2021. Prater did everything he reasonably could to comply with the guidelines.

29. On January 29, 2021, the Hospitality Department held a meeting of faculty and staff by Zoom. Prater attended that meeting. In that meeting Prater advocated for a formalized and modernized scheduling plan because he had a student placed in his class at the same time she was expected to be in another class.  No student can be expected to be in two places at the same time. Prater advocated fiercely for his student, as he was directed by Chief Academic Officer Dr. Mickey McCloud on two separate occasions the previous semester.

4

30. On February 23, 2021, Prater sent an email to Dean Cox asking to meeting with him. In response, Dean Cox sent an email to Prater the following day with regard to complaints involving Prater's conduct at the Hospitality Department meeting held by Zoom on January 29, 2021. Dean Cox indicated that the issues raised by Prater in the meeting were not inappropriate, but that the manner in which he raised the issues was inappropriate. Prater then insisted on having a meeting with Dean Cox, and a representative from Human Resources to discuss the matter.

31. When Dean Cox started a meeting with Prater about the issues of Prater's concern, Prater requested that the meeting be scheduled for a time when he was able to have his union representative present. Instead, Dean Cox sent an email with the concerns and did not respond to a request to reschedule the meeting until it was requested through Human Resources by Prater and a union representative.

32. Additionally, in the meeting with Human Resources, Dean Cox, Prater and the union representative, the issues brought up by the complaints of Marcellus and McNabb were addressed At the conclusion of the meeting, Dean Cox, Leslie Hardin, Vice President of Human Resources agreed that the matters had been addressed and that all parties would move forward with changes. Included in the changes was that Dean Cox would implement formal policies and procedures in the Hospitality Department. Those changes never took place.

33. In response to Dean Cox's email Prater requested a meeting with Human Resources and that request was granted.

34. On March 16, 2021, Marcellus and McNabb submitted complaints to JCCC about Prater's conduct on March 15 and 16, 2021. Marcellus's complaint was submitted at 9:04 a.m. and McNabb's was submitted at 3:09 p.m.

35. On or about March 17, 2021, Prater met with Dean Cox and Hardin. Kansas National

Education Association representative Tammy Baltzell was present as well. At that meeting, a discussion was had regarding Prater's conduct at the January 29, 2021, Department meeting.  In that meeting, Prater was permitted to voice some of his concerns, and there was a discussion of problems in the Hospitality Department and some communication issues. At the conclusion of the March 17 meeting, the issues were resolved, and Prater agreed that he would act in a manner more conducive to collegiality in the workplace.

36. Following the March 17 meeting, Prater was not put on an improvement plan, even though JCCC utilized improvement plans from time to time There is no evidence, or allegation, of any unprofessional behavior by Prater that occurred following his meeting with Dean Cox and Hardin on March 17.

37. On April 8, 2021, Prater was first informed of the complaints against him by Marcellus and McNabb when he received an email from Colleen Chandler, JCCC Director of Human Resources. On the same day, Chandler informed Prater that JCCC was investigating the concerns of retaliation he had raised about Dean Cox—concerns that had been formally presented to Human Resources more than a year earlier.

38. On April 16, 2021, Justin McDaid, Director of Audit and Advisory Services notified Prater by email that Human Resources was not cooperating with the investigation into Prater's complaint about Human Resources not investigating Prater's complaint of retaliation by Cox.

39. On May 24, 2021, Dean Cox signed Prater's 2021 performance review and indicated that Prater had met expectations, which was the highest rating he could give Prater. After Prater received the 2021 performance review, he thought that he was in good standing with JCCC, and that he was on track to teach the next academic year. Prater had been placed on the class schedule.

## INVESTIGATIONS

40. JCCC hired an outside investigator, Janes Grandes, to investigate the complaints by Marcellus and McNabb against Prater. On July 8, 2021, Grandes issued her Final Investigative Report regarding the complaint against Prater. As part of her investigation, Grandes did not interview all of the full-time faculty in the JCCC Hospitality Department. Grandes also failed to include evidence presented to her by Prater showing dysfunction within the Department. She refused to speak with witnesses Prater had identified who could speak to the dysfunction.

41. One of the faculty members interviewed by Grandes was Chrystal Tatum, who was just finishing her first year as a full-time faculty member. Tatum said that Prater was respectful of her, and that he did not ask her to sign a "petition." She said that she had just "heard about" a "petition" from other instructors. Another faculty member interviewed by Grandes was Damian Fraase. Fraase said that his relationship with Prater was purely professional and that he had no conflicts with Prater. He said Prater had not expressed any frustration with him about McNabb. Fraase did not mention a "petition" being circulated by Prater. 42. Another faculty member interviewed by Grandes was Chris Bell. Bell stated that others in the Department, including Jason Gray and Marcellus, had said that McNabb was "not up to the task." Bell said that Prater did not ask him to sign a "petition" regarding McNabb.

43. Another faculty member interviewed by Grandes was Edward Adel. Adel said that Prater put together a "petition" to get McNabb fired, and that Prater asked students to "write something" that would get McNabb terminated. A previous investigation initiated by Prater into the former director indicated that there was conflict between Prater and Adel due to Prater's participation in an investigation into student complaints into Adel. Another faculty member interviewed by Grandes was Jason Gray. Gray said Prater did not ask him to sign a "petition."

Gray said he did not feel that he was in a hostile work environment. Gray said that Prater apologized to him and Bell separately for his conduct at the January 29 Department meeting, but said that Gray thought Prater's passion in the meeting was not directed at individuals.

<u>DUE PROCESS HEARING TESTIMONY</u>

44. The only witnesses interviewed by Grandes who said there was a "petition" of some sort circulated by Prater regarding McNabb were Marcellus and Adel. Additionally, Michelle Riley, another faculty member, later testified at a Due Process Hearing that Prater did not ask her to sign a "petition" and that no petition existed. Grandes never saw a copy of a "petition" and never followed up with any of the students who were allegedly asked to write a statement. Prater denied circulating a "petition" regarding McNabb and denied that he asked any student to write statements about McNabb. Some of the witnesses interviewed by Grandes supported Prater.

45. Grandes concluded that the evidence showed that not all of the conflicts and issues between Prater, Marcellus and McNabb were the result of misconduct by Prater. The conflicts between them appeared to be related to some legitimate departmental miscommunication, such as who had the responsibility to put in orders, when orders must be submitted, and the like, resulting from evolving guidelines, some potentially confusing direction from Dean Cox, such as Prater's understanding that he should go to Marcellus with concerns, and some potential room for improvement in McNabb's job performance.

46. Nevertheless, Grandes' report concluded that "this investigation has yielded credible information establishing by a preponderance of the evidence that Prater's conduct and interactions with Marcellus and McNabb fell below the expectations of professionalism, courtesy, dignity and respect as set forth in the Full-Time Faculty Job Description." Grandes' report did not conclude that Prater should be terminated by JCCC. Grandes report also failed to detail instances

8

in which Marcellus, McNabb, Cox and McCloud all fell below the JCCC standard of professionalism, courtesy, dignity and respect, despite numerous attempts to address them.

47. Hardin later agreed in her testimony in a Due Process Hearing that it was appropriate for Prater to express his concerns regarding McNabb to Marcellus. McCloud also testified in the Due Process Hearing that he always had a good relationship with Prater.

48. Before 2021, Prater had brought forward some concerns about a previous director of the Hospitality Department, which were found to be true, and resulted in that director being terminated.

49. McCloud testified in the Due Process hearing that when Prater came to him with reports, which were sincerely held, that Prater did not have a hostile intent. McCloud also testified that he had watched a video of the January 29 Zoom meeting of the Department. He testified that he did not believe Prater's actions merited termination. Rather, it just merited a discussion with Prater that future unprofessional action by Prater could lead to termination Prater's March 17 meeting with Cox and Hardin addressed that issue. No further behavior or incidents were reported by Prater. Yet, a complaint was made against Marcellus for similar behavior, which was never investigated or adjudicated.

50. In two video addresses to the faculty, McCloud thanked the faculty for doing the right thing by standing up for students regardless of any disagreements that it might cause even if those "disagreements are strenuous."

51. McCloud testified at the Due Process hearing that personality conflicts among faculty occur from time to time and, by themselves, do not merit termination. McCloud also testified at a hearing that in 2018 he had asked Prater to speak at the Kansas Leadership Summit about the Hospitality Department.

52. Prater testified at the Due Process hearing that he had never been told – before learning of McNabb's complaint – that McNabb had a problem with him. Prater testified that he limited his interactions with McNabb. Prater testified that he went to Marcellus with his concerns regarding McNabb because that is what Dean Cox told him to do. Prater testified that he denied calling McNabb "dumb." Prater testified that he denied the nature of the allegations made against him in the complaint by McNabb.

53. Prater sent an email in February, 2021, to Dean Cox begging him to address the problems in purchasing. Dean Cox encouraged Prater to take his concerns to Marcellus. Additionally, Prater was told by Dean Cox that the issues would be solved immediately and that no problems should exist after spring break. There were problems in purchasing regarding chicken and vermicelli that occurred after spring break.

54. Prater testified at the Due Process hearing that he never verbally threatened Marcellus, nor did he ever make physical contact with him. Prater testified that he denied the nature of the allegations made against him in the complaint by Marcellus. And, Marcellus testified that he never felt threatened by Prater.

55. Larry Reynolds served as the Interim Dean of the Business Division from May, 2017 through July, 2018. The Department of Hospitality is a part of the Business Division. While he was Interim Dean of the Business Division, Dean Reynolds testified at the Due Process hearing that he was Prater's supervisor. Dean Reynolds testified that he never had any concerns with Prater.

56. During Reynolds's time as Interim Dean of the Business Division he testified that, Prater, Carol Sparks, Edward Adel, Jason Gray, David Smith and Michelle Riley all voiced concerns to him about the job performance of McNabb. Reynolds testified that he raised concerns about purchasing in the Hospitality Department to McCloud. Dean Reynolds testified he believed

that Prater's concerns were valid. Trustee Lee Cross and other trustees had also been made aware of the dysfunction by Prater and by Michelle Riley in the Hospitality Department several years earlier.

57. Dean Reynolds testified he never saw Prater conduct himself in a hostile or unprofessional manner.

58. McCloud acknowledged in his testimony in the Due Process hearing that Prater was not the only one placing purchase orders who had concerns about purchasing. He also acknowledged in his testimony that there had been problems with leadership in the Hospitality Department.

59. Jamie Cunningham was an associate professor of biology at JCCC, and had been at JCCC for fourteen years at the time of the Due Process hearing. Cunningham served with Prater on the JCCC Educational Affairs Committee from 2019 to 2021. Prater was chair of the Committee for a period of time, and Cunningham was vice-chair.

60. Cunningham and Prater met on a nearly weekly basis on the Committee, and Cunningham testified that she never saw Prater display any unprofessional or hostile conduct. Cunningham's comment is especially significant in that the Committee is widely regarded to be the most stressful and contentious committee on campus. For that matter, no one else complained about Prater's work on the Committee as Chair and Vice Chair.

61. In 2017, the President of JCCC asked Prater to speak with U.S. Secretary of Education Betsy DeVos about the Hospitality Department. In 2020, Dean Cox asked Prater to make a presentation to the Kansas Board of Regents.

62. Prater testified at the Due Process hearing that he was unaware that anyone in the Department was afraid of him. He had the support of numerous colleagues at JCCC.

63. Prater testified that he had not yelled at any co-workers, except for one instance when he yelled at Marcellus several years ago before Cox became Dean after Marcellus knowingly put a student in an unsafe situation. This incident was provoked by Prater learning that a student who had made a Title IX complaint was being placed under evaluation for a final graduation exam by the individual the student had complained about.

CIRCUMSTANCES LEADING TO TERMINATION

64. JCCC also hired Grandes to investigate Prater's complaint against Dean Cox and Marcellus. On August 20, 2021, Grandes issued her Final Investigative Report regarding Prater's complaint against Dean Cox and Marcellus.

65. Grandes' report regarding Prater's complaint concluded that "the preponderance of the evidence does not support Prater's allegations that Cox and Marcellus had engaged in retaliation in violation of JCCC's Employee Complaint Policy 421.01. Grandes also acknowledged that she did not interview everyone in the department nor did she include or follow up on evidence provided by Prater.

66. On June 28, 2021, Prater sent an email to Trustee Cross regarding the systemic dysfunction in the Hospitality Department. Prater sent the email at the urging of Trustee Cross. Prater wanted to address these concerns outside of a public forum to avoid any embarrassment to JCCC. Roughly two weeks later, on July 16, 2021, JCCC placed Prater on administrative leave and subsequently terminated him.

67. The July 16, letter placing Prater on paid administrative leave, and which was hand-delivered a letter to him, stated that an investigation of a complaint against him indicated that he had "engaged in conduct and interactions that fall below the expectations of professionalism, courtesy, dignity, and respect as set forth in the Full-Time Faculty Job Description." The letter did

not arrive on July 16, or shortly thereafter, and was eventually hand-delivered to him. JCCC used an old address for the letter even though Prater had updated his address years earlier. As a result, Prater had only a few hours' notice before the Board of Trustees met to vote on his termination. JCCC did not provide Prater any details from the results of the investigation other than what was in the July 16 letter.

68. On August 31, 2021, Colleen Chandler issued a letter to Prater, to the wrong address, informing him that the investigation into the complaint filed against him by McNabb and Marcellus was complete. The letter stated that based "upon a preponderance of the evidence, the investigation revealed that you have failed to meet the expectations of your job description … Specifically, the investigation revealed evidence you engaged in efforts to have another employee terminated, including asking other employees to sign a letter or petition to have the employee removed." The letter also stated that Prater had dealt with issues of miscommunication inappropriately, and then outlined the following specific examples:

"1. Exhibiting hostile behaviors, including yelling at coworkers and speaking to others rudely, resulting in coworkers feeling like they have to 'tiptoe' around you.

2.  Failing to follow evolving purchasing guidelines then reacting badly, such as yelling and taking items off another instructor's cart, when items are not available.

3.  Complaining to other employees when another employee makes mistakes instead of trying to resolve it with that party."

69. On September 7, 2021, McCloud sent a letter to Prater, to the wrong address, informing him that it was being recommended to the JCCC Board of Trustees that Prater's contract be terminated. The letter repeated the allegations from the August 31 letter. This letter also alleged that Prater had "engaged in efforts to have another employee terminated, including asking other

13

employees to sign a letter or petition to have the employee removed." Additionally, that letter stated as follows: "This most recent investigation is not the first time concerns about your behavior have been raised and brought to your attention." The letter then went on to quote Dean Cox's statement to Prater from the narrative with his 2020 performance evaluation of Prater that his coworkers were afraid of him, and that there was a perception that he would report his coworkers for wrongdoing. The letter also cited Dean Cox's email to Prater on February 24, 2021, regarding Prater's conduct at the January 29, 2021 Zoom Department meeting. A letter sent at the same time as the August 31st letter informing him of the outcome of the investigation into Cox and Marcellus for retaliation stated that the narrative of the 2020 performance evaluation was not punitive and could not be considered as detrimental to his employment. Yet the September 7, letter stated that it was one of the reasons for his termination.

70. On September 17, 2021, Greg Musil, the Chairman of the JCCC Board of Trustees, issued a letter to Prater repeating the allegations from the July 16, 2021 and August 31, 2021 letters, and advising Prater that the Board had voted to terminate his contract.

71. In a letter dated September 22, 2021, Prater requested a Due Process hearing. JCCC paid Prater through September 28, 2021.

<u>PRATER'S REPORTS OF UNLAWFUL CONDUCT</u>

72. In November, 2018, Prater alerted Dean Cox of a violation of the Family and Educational Rights and Privacy Act by the Director of Hospitality, Mik Milster.

73. This violation of FERPA occurred when a student advised Prater that the student had heard Milster discussing a student's failure who had attempted to gain certification as a sous chef. Milster identified the student by name.

74. Cox refused to take the name of the student from Prater. Cox never contacted the student.

75. On September 28, 2019, Prater alerted Cox of a second FERPA violation regarding Mik Milster, Director of Hospitality.

76. The second instance occurred when several students and the professor of a class where Milster spoke said that Milster had informed an entire class about the lack of academic progress of one student. Milster identified the student by name.

77. Prater attempted to arrange a meeting with Cox about the second FERPA violation.

78. Cox refused to meet with the student to investigate the report. Another faculty member, Dave Krug, heard Cox yelling that he would not meet any student who had a complaint unless the student met with the director first about the person complained about and that he did not know why he was being bothered with it [the FERPA report].

79. The following day, Prater alerted Larry "Mickey" McCloud of Cox's refusal to meet with the student. McCloud did not respond to this alert.

80. Prater then reported the second FERPA violation to Leslie Quinn, Director of Enrollment Services & Registrar. Prater was told that the response to a FERPA violation is a matter for a Dean to decide.

81. The student in question with the second FERPA violation stopped taking classes in his final semester and did not graduate.

82. Prater also reported instances of sex discrimination and sex harassment of women to Trustee Cross. These instances violated Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments Act of 1972 and the Kansas Act Against Discrimination. Prater reported these instances to Cox and McCloud as well.

83. One report that Prater made to Cross and to the Human Resources office in the Fall of 2020 was that Mik Milster had made comments of a sexual nature about female students in the Hospitality program

84. Prater reported that a colleague Michelle Riley had been tasked with work that she was not compensated for yet her male colleagues were compensated for the same work. After an investigation, JCCC provided back pay to Riley but did not acknowledge any sex discrimination.

85. Colleen Chandler, Human Resources Director, told Prater that she considered him to be a Title IX whistleblower.

86. Prater's reports of mishandling of food, purchasing practices of food and similar instances violated the Kansas Administrative Regulations related to food safety as enforced by the Kansas Department of Agriculture, and the Kansas Food, Drug and Cosmetic Act. Prater made Cox, Marcellus and McCloud aware of those issues.

87. On multiple occasions, Prater reported that food had been improperly stored on the floor and that food in various stages of rot were maintained. These reports were made to Cox, McCloud and to Cross.

88. Prater reported on multiple occasions that the eye wash station, which was in a locked room. Milster had taken all keys to the lock. The eye wash station is a critical component of a commercial kitchen because it permits a chef or other kitchen worker to self-treat themselves in the event that they are exposed to toxic chemicals. That report was also made to Cox, McCloud and Cross.

89. In an email on February 12, 2018, Prater reported to Larry Reynolds that meat had been improperly stored above foods like vegetables.

16

90. In an email dated February 23, 2021, Prater reported to Marcellus that food provided to faculty for a class was unusable and had "obvious molding." Marcellus advised Cox of this problem by way of an email on February 23, 2021.

91. In an email to Marcellus and Cox dated February 23, 2021, Prater found that basil provided to him for a class "was wilting and turning slimy."

92. The Kansas Food, Drug and Cosmetic Act, K.S.A. 65-655 includes within its coverage any nonprofit organization that routinely serves food, Subsection (v)(1) and bakeries where food is provided for the public with or without charge. Subsection (v)(2)

93. The Hospitality Department at JCCC provided weekly sales of baked goods to the general public during Prater's employment there.

94. K.S.A. 65-657(r) makes it unlawful to fail to protect meats, fish, fowl or game for human consumption from any substance that may injuriously affect it.

95. Under the Food, Drug and Cosmetic Act, 21 U.S.C. § 342(a)(3) food is considered adulterated if it consists in whole or in part of any filthy, putrid or decomposed substance, or if it is otherwise unfit for food.

<u>COUNT I</u>
<u>KANSAS RETALIATORY DISCHARGE – WHISTLEBLOWING</u>
<u>(DEFENDANT JCCC ONLY)</u>

96. The Plaintiff incorporates by reference Paragraphs 1 through 95 above as though fully set forth herein.

97. A reasonably prudent person would have concluded that employees of the Defendant JCCC were engaged in activities that violated rules, regulations or law pertaining to public health, safety and the general welfare, including, but not limited to violations of the Family and Educational Rights and Privacy Act, the Kansas Administrative Regulations related to food safety

as enforced by the Kansas Department of Agriculture, and the Kansas Food, Drug and Cosmetic Act.

98. The Defendant JCCC had knowledge of the Plaintiff reporting violations of rules, regulations or laws before the Plaintiff's termination.

99. The Defendant JCCC's stated grounds for the Plaintiff's termination were pretextual.

100. The Plaintiff's reports were the cause of his termination by the Defendant JCCC.

101. The Plaintiff has sustained damages as a result of his termination.

WHEREFORE, the Plaintiff requests the Court to enter judgment in his favor against the Defendant JCCC in excess of $75,000, for punitive damages against any responsible individual pursuant to K.S.A. 75-6105(c), for his costs and for such other and further relief as the Court may deem just and equitable.

## COUNT II
### FIRST AMENDMENT RETALIATORY DISCHARGE FOR EXERCISING SPEECH RIGHTS – 42 U.S.C. § 1983
### (DEFENDANTS COX, MARCELLUS, McCLOUD AND CROSS ONLY)

102. The Plaintiff incorporates by reference Paragraphs 1 through 95 above as though fully set forth herein.

103. The First and Fourteenth Amendments to the U.S. Constitution provide for the right of an individual to have freedom of speech.

104. The contours of that right were clearly established at the time the retaliatory events and termination occurred.

105. A reasonable person would have known or should have known about that right.

106. The Defendants Cox, Marcellus, McCloud and Cross, who were involved with the

18

retaliation and termination, caused the Plaintiff to be deprived of his First and Fourteenth Amendment rights.

107. The Defendants Cox, Marcellus, McCloud and Cross, who were involved with the retaliation and termination, acted under color of state law.

108. The conduct of the Defendants Cox, Marcellus, McCloud and Cross, who were involved with the retaliation and termination, resulted in damages to the Plaintiff.

109. The speech uttered by the Plaintiff was not ordinarily within his official duties.

110. The Plaintiff's speech related to a matter of public concern.

111. The interests of the governmental employer do not outweigh the interests of the Plaintiff.

112. The Plaintiff's protected speech was a motivating factor in the retaliation and termination.

113. The Defendants Cox, Marcellus, McCloud and Cross would not have retaliated and terminated the Plaintiff in the absence of the protected speech of the Plaintiff.

114. The Plaintiff has sustained damages.

WHEREFORE, the Plaintiff requests the Court to enter a judgment in favor of him against the Defendants Cox, Marcellus, McCloud and Cross in excess of $75,000, for his taxable costs, for non-taxable costs, for his expert witness fees, for his litigation expenses, and for a reasonable attorney fee all pursuant to 42 U.S.C. § 1988 and for such other and further relief as the Court may deem just and equitable.

## COUNT III
## FOOD SAFETY MODERNIZATION ACT RETALIATION, 21 U.S.C. § 399
## (DEFENDANT JCCC ONLY)

115. The Plaintiff incorporates by reference Paragraphs 1 through 95 above as though fully set forth herein.

116. The Plaintiff's reports to Cox, Marcellus and McCloud about food safety issues were a contributing factor in the Defendant JCCC's retaliatory decision to terminate him.

117. The Plaintiff reasonably believed that Defendant JCCC was in violation of the Food Safety Modernization Act (FSMA).

118. The Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq, is within the same statutory Chapter as the FSMA, which makes the Food, Drug and Cosmetic Act enforceable through the retaliation provisions of the FSMA. 21 U.S.C. § 399d(a)(1).

119. The Plaintiff's reports were protected activity under the FSMA.

120. The Defendant JCCC had knowledge of the Plaintiff's reports.

121. The Defendant JCCC's termination of the Plaintiff was an employment that was adverse to the Plaintiff, disadvantaged the Plaintiff, or would dissuade a reasonable worker from exercising protected rights under the FSMA.

122. A causal connection existed between the protected activity and the adverse action.

123. The Plaintiff has sustained monetary damages from the termination.

WHEREFORE, the Plaintiff requests the Court to enter a judgment against the Defendant JCCC for his back pay with interest pursuant to 21 U.S.C. § 399d(b)(4)(B)(ii), special damages, including litigation costs, expert witness fees, and reasonable attorney fees pursuant to 21 U.S.C. § 399d(b)(4)(B)(iii) and for such other and further relief as the Court may deem just and equitable.

## COUNT IV
## RETALIATORY DISCHARGE IN VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS ACT OF 1972, 20 U.S.C. § 1681, ET SEQ.
## (JCCC ONLY)

124. The Plaintiff hereby incorporates by reference Paragraphs 1 through 95 as though fully set forth herein.

125. The Plaintiff made reports about conduct that he reasonably believed amounted to sex harassment sex discrimination.

126. The Plaintiff's reports were protected activity as advocacy conduct.

127. JCCC terminated the Plaintiff on the basis of sex.

128. The Plaintiff's reports caused his termination.

129. The Plaintiff has sustained damages as a result of his termination.

WHEREFORE, the Plaintiff requests the Court to enter a judgment against JCCC in excess of $75,000, for his reasonable attorney fees, for his costs, for his expert witness fees and for such other and further relief as may be just and equitable.

Respectfully submitted,

*/s/ Theodore J. Lickteig*
Theodore J. Lickteig #12977
Lickteig Law Firm, LLC
12760 W. 87th Street, Suite 112
Lenexa, Kansas 66215-2878
913-894-1090
tjllawoffice@planetkc.com
*Attorney for Plaintiff*

## **JURY DEMAND**

The Plaintiff, by and through undersigned counsel, requests a jury trial on all issues so triable pursuant to Section 5 of the Bill of Rights to the Kansas Constitution as to the Kansas law-based claims and pursuant to the Seventh Amendment to the United States Constitution and to

Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

*/s/ Theodore J. Lickteig*
Theodore J. Lickteig #12977
Lickteig Law Firm, LLC
12760 W. 87th Street, Suite 112
Lenexa, Kansas 66215-2878
913-894-1090
tjllawoffice@planetkc.com
*Attorney for Plaintiff*

CERTIFICATE OF SERVICE

I, Theodore J. Lickteig, hereby certify that I filed the above and foregoing with the Clerk of the Court on this 3rd day of April, 2024, by using the Court's CM/ECF system, which will notify the following of the filing:

Derek T. Teeter
Derek.teeter@huschblackwell.com
Michael T. Raupp
Michael.raupp@huschblackwell.com
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
*Counsel for Johnson County Community College,*
*Leroy Cox and Larry McCloud*

John F. Doyle
jfdoyle@constangy.com
1201 Walnut Street, Suite 2350
Kansas City, Missouri 64106
*Counsel for Jerry Marcellus*

Daniel F. Church
dchurch@mwcattorneys.com
Blake H. Butner
bbutner@mwcattorneys.com
8330 Ward Parkway, Suite 300
Kansas City, Missouri 64114
*Counsel for Lee Cross*

*/s/ Theodore J. Lickteig*